# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 28, 2011 Session

## STATE OF TENNESSEE v. WAYNE ROBERT WAIT

**Appeal from the Circuit Court for Blount County**
**No. C-16182    Michael H. Meares, Judge (at trial)**
**Jon Kerry Blackwood, Senior Judge (at sentencing)[1]**

---

**No. E2010-01212-CCA-R3-CD - Filed October 28, 2011**

---

A Blount County jury convicted the Defendant, Wayne Robert Wait, of second degree murder and, thereafter, the trial court imposed a sentence of 18 years at 100% in the Department of Correction.  On appeal, the Defendant raises the following issues for our review: (1) whether the trial court abused its discretion in allowing a police officer to testify about blood spatter evidence he observed at the scene when the officer was not tendered as an expert in blood spatter analysis; (2) whether the trial court erred in limiting the admission of prior violent acts allegedly committed by the victim offered to corroborate the Defendant's contention that the victim was the first aggressor and to support his self-defense claim; and (3) whether his sentence is excessive because the trial court failed to apply mitigating factors and gave too much weight to the sole enhancing factor.  We conclude that there is no reversible error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Robert W. White (at sentencing and on appeal) and Damon Wooten (at trial), Maryville, Tennessee, for the appellant, Wayne Robert Wait.

---

[1]The trial judge, Michael Meares, who presided over the Defendant's trial was not re-elected.  The successor judge was disqualified from participating in the matter because he had presided over the Defendant's preliminary hearing.  Therefore, a new judge, Jon Kerry Blackwood, had to be designated to adjudicate the motion for new trial hearing and sentencing hearing.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Michael A. Flynn, District Attorney General; Tammy M. Harrington and Robert L. Headrick, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

This appeal arises out of the August 12, 2006 fatal shooting of the victim, Michael Troy Bruce. On February 5, 2007, a Blount County grand jury charged the Defendant with the first degree premeditated murder of the victim. See Tenn. Code Ann. § 39-13-202. The Defendant's trial was held April 23-26, 2008.

Murray Edward Boring testified that on August 12, 2006, he lived on Hill Haven Road in Louisville. The cabin he had been building on the property was still unfinished at that time, and Mr. Boring was staying in the loft of the cabin or sometimes in a camper on the property. The Defendant, aka "Moses," and the victim both lived in the same community with Mr. Boring; the Defendant lived in a camper next to the victim's residence.

When asked how he began the day on August 12, 2006, Mr. Boring replied that he and the Defendant had gathered up bottles on the property and were hauling them to the dump; they did this in response to complaints by the victim, who was worried about his father, the owner of the property, seeing all the trash. While driving off the property, the two men saw the victim and gestured to him to look at the bottles they had collected. After going to the dump, Mr. Boring and the Defendant stopped at a gas station to purchase alcohol and then returned home to watch television. The victim went to Phelps Dairy Farm to cut up a fallen tree.

Mr. Boring testified that he, the Defendant, and the victim were all friends and that they often drank together and watched westerns. On the day in question, the Defendant and Mr. Boring were drinking beer—the Defendant consuming maybe two or three—and watching television at the cabin when the victim returned that afternoon. According to Mr. Boring, the victim had been drinking and was agitated; the victim asked the Defendant, who was sitting on the sofa, to give him money for marijuana, but the Defendant said no. The victim became angry and kicked the Defendant's beer bottle over, breaking it. Mr. Boring told the victim to "take it outside" if he was going to fight the Defendant. The victim then told Mr. Boring that it was "none of [his] business." Mr. Boring said, "well, I guess it is, you're in my house[,]" and got up out of the chair that he had been sitting in. The victim then picked up a two-by-four piece of lumber to confront Mr. Boring. In response, Mr. Boring picked up a piece of lead pipe and knocked the two-by-four out of the victim's hands. Mr. Boring then threw the lead pipe out into the yard.

-2-

At some point, the Defendant had exited the cabin to retrieve his shotgun, which he had placed in Mr. Boring's camper trailer just outside the cabin. Mr. Boring said he and the victim were standing "just kind of staring each other down," when he "caught some movement" behind him, so he turned and saw the Defendant in the other doorway holding the shotgun. Mr. Boring asked the Defendant to put the gun down, but the Defendant raised his weapon. Mr. Boring said that he felt a shot come past him as he was dropping his hand and that the shot hit the victim in his chest. Mr. Boring was standing very close to the victim when the victim was shot, within two to three feet, causing him to be covered with blood "from head to toe[.]" Mr. Boring opined that, due to the location of the victim's wound, he "was dead before he hit the ground." Realizing that he could not help the victim, Mr. Boring "was getting out of there [b]ecause [he] didn't know whether [he] was going to be the next one that got hit with something." As Mr. Boring was exiting the cabin, the Defendant said, "Well, I done [sic] it this time. Go over Bill's and call." Mr. Boring left and phoned 9-1-1 at 3:13 p.m. After placing the call, Mr. Boring waited by the road for the police to arrive; the Defendant also waited.

According to Mr. Boring, the whole incident lasted only "a couple of minutes at the most." Mr. Boring stated that the Defendant was standing outside the house when he fired the shotgun and opined that the victim was not moving forward when the Defendant shot him.

Mr. Boring testified that both the victim and the Defendant drank frequently and both were known to carry firearms. Mr. Boring characterized the victim as "a little agitating sometimes" and "a different type of person" who "had a tendency to get on people's bad side[.]" Mr. Boring described an incident where the victim shot at his feet while they were watching a movie; the bullet "just barely missed" his feet. The victim was mimicking a John Wayne film, and after Mr. Boring "jerked [his] feet back[,]" that was the end of it. Mr. Boring characterized the Defendant as "one of the nicest men [he] ever met" and a "peaceful man." Mr. Boring opined that the Defendant was not intoxicated at the time he shot the victim, stating, "No. He's drank more than that."

Following the 9-1-1 call, Detective James Wilson of the Blount County Sheriff's Department was dispatched to the scene. Detective Wilson talked to officers already on the scene to get an idea of what happened; he was informed that the Defendant had been detained and was seated in a patrol car. Detective Wilson proceeded to process the scene, recovering the "pump-action" 12-gauge shotgun from the trailer behind Mr. Boring's cabin, and discovering that the Defendant had loaded the weapon with double-aught buckshot. The shell casing was still inside the shotgun, accordingly it was concluded that the Defendant had not attempted to reload the weapon after firing at the victim. Detective Wilson also found

a pellet—consistent with the double-aught buckshot—on top of the chair that Mr. Boring had been sitting in prior to the shooting.

Detective Wilson's investigation confirmed that the trajectory of the shot came from near the door and revealed that the weapon was pointed in a "downward angle" when it was fired. The two-by-four piece of wood the victim was holding, before being knocked of his hands, was also taken into evidence. According to Det. Wilson, the path of the nine pellets showed that "the victim's body was somewhat angled" when he was shot, despite that the fact that the Defendant and the victim were approximately the same height. He observed that there were no injuries to the victim's hands, but acknowledged on cross-examination that this was possible if the victim's hands were raised. Also, two knives were discovered in the victim's back-pants pocket.

Detective Wilson examined the victim's body and observed that there was a large amount of blood pooled around the body. Detective Wilson testified that his observations of blood spatter and pooling at the scene corroborated Mr. Boring's placement of the individuals present at the scene and the fact that the victim was standing, and not moving forward, at the time he was shot.

After processing the scene, Det. Wilson, along with Det. David Henderson, interviewed the Defendant, who gave a lengthy statement. Detective Wilson confirmed that the Defendant was cooperative with authorities, that he offered no resistance, and that there was no evidence he disturbed anything at the scene.

In his statement to the authorities, the Defendant stated that the victim had a violent temper and that the victim often put guns to the Defendant's head. When the victim came in the cabin, he kicked over the Defendant's bottle, breaking it, and was swinging his fists in the Defendant's face. The Defendant walked out and retrieved the shotgun that he had placed in Mr. Boring's camper earlier that day after Mr. Boring had told him that the victim was on a "warpath." He got the gun "to draw a line" with the victim. The Defendant said that the victim started toward him to take the gun away and that then it "got out of control." He could not allow the victim to disarm him because the victim was "strong and mean as a snake" with "two aggravated assaults for waving guns at people." According to the Defendant, he had suffered mental and physical abuse over the years at the hands of the victim, including being pistol-whipped by him. He believed that, if disarmed by the victim, the victim would have used the shotgun to beat him to death.

The Defendant stated that he was on the back porch of the cabin and that the victim was six to eight feet away, coming towards the back door, when he fired the shot. The Defendant indicated that he did not get the weapon completely "shouldered" before firing.

After shooting the victim, the Defendant returned the shotgun to the camper near Mr. Boring's trailer. He claimed that Mr. Boring remained seated throughout the altercation. The Defendant admitted that he intentionally shot the victim and that the gun did not accidentally discharge; he acknowledged that he could have left the cabin rather than returning armed to confront the victim.

A blood sample was collected from the Defendant at 1:20 a.m. on August 13, 2006, and testing showed that the level of alcohol in the Defendant's blood was .06% at that time and that no drugs were detected. A sample was also taken from the victim at the time of autopsy, which reflected that the level of alcohol in his blood was .25% and that no drugs were detected.

Doctor Darinka Mileusnic-Polchan, Acting Chief Medical Examiner for Knox County, testified as an expert witness in forensic pathology. She stated that the cause of death was a gunshot wound to the chest, which shredded the victim's heart and caused a "large amount of blood that gushed from the body." She testified that based upon her review of the scene, the photographs, and the autopsy of the victim (performed by a different medical examiner), the victim was at an angle at the time he was shot, i.e., not directly facing the shooter. Based upon her review of the blood spatter at the scene, her opinion was that the victim was not advancing at the time he was shot and that he collapsed from a standing position:

> Well, to me, it seems to me that it's relatively simple scene, that [the victim] would be stationary, facing Mr. Boring and facing the TV, in that particular area. Shooting scenes are always tricky because we don't really know up front in what kind of position or what kind of movement the victim or the perpetrator could be. They frequently end up being dynamic. Again, it depends really on what was happening right before the shooting. In this particular case, all the indications were that Mr. Boring and the victim were standing almost facing each other at an angle. That makes sense, because that's what I see at the time of the autopsy, the way the trajectory goes through the body.
>
> As far as the shooter, I cannot really tell what he was doing. But I can tell you that he was relatively close and the barrel and the victim were about within three feet.

Dr. Mileusnic-Polchan testified that it was possible that the victim was conscious for as much 10 to 15 seconds after being shot, but here it appeared that the victim "falls over in the direction where he was standing."

Three witnesses testified for the defense. Robert Newton Perry, III, and Brenda Kay Gibbs testified that the victim had a reputation for violence in the community and about a conversation they had with Mr. Boring the day after the shooting. Mr. Perry relayed what he was told by Mr. Boring as follows:

> In the course of the conversation, [Mr. Boring] said that [the victim] came in, got abusive with [the Defendant], and picked up a board and was threatening with it. And [Mr. Boring] said you don't come in my house and tell people to leave my house and cause trouble with them in my house, and was asking [the victim] to leave and to stop. [The Defendant] got up and left, went out one door. Came back in the other after [Mr. Boring] had picked up pipe and knocked the board out of [the victim's] hand with it, which I don't think [the Defendant] knew that. [The Defendant] came back in the other door, had a gun. Said that he said, "No, Moses," and that [the victim] turned, put one foot like this and the gun went off and [the victim] was shot.

According to Mr. Perry, the victim was not truthful, was dangerous, and always carried a gun; he characterized the victim as "a canon ready to go off. . . . He would get real violent quickly, over nothing." Mr. Perry described the Defendant as "rally easygoing, laid back, downright submissive, especially to [the victim]"—the Defendant had a reputation for peacefulness. Mr. Perry opined that Mr. Boring "was more sober than [he'd] seen him in a long time" on the day this conversation took place.

Ms. Gibbs was also present when the conversation took place, and she gave a similar account of what Mr. Boring said to them that day: "Said [the victim] turned, took a step toward [the Defendant], and the shot was fired." She described the victim as "very violent," as "easily agitated" when he was drinking (which was almost daily), and as untruthful. According to Ms. Gibbs, the Defendant was "[v]ery peaceful."

Michael Owle testified that the victim had often threatened to kill the Defendant and had brandished a gun around the Defendant. Mr. Owle also relayed an incident where the victim had fired a gun near the Defendant's feet, and the bullet "landed" within 12 to 16 inches of the Defendant's feet. Mr. Owle said that the more drunk the victim got, the more "violent he tended to get[,]" and that even if the victim was not drinking, he would get violent if he "didn't get his way and everybody do [sic] what he said[.]" Mr. Owle also said that the victim was armed most of the time; however, he described the Defendant as "one of the most peaceful men [he'd] ever met."

-6-

Following the conclusion of proof, the jury found the Defendant guilty of the lesser-included offense of second degree murder. See Tenn. Code Ann. § 39-13-210. On November 20, 2009, the trial court sentenced the Defendant to the Department of Correction for 18 years, as a violent offender. He now appeals.

## ANALYSIS

On appeal, the Defendant argues the trial court erred in three respects: (1) The trial court abused its discretion in allowing a non-expert witness to engage in expert testimony about blood spatter evidence; (2) The trial court erred when it excluded proof about prior violent acts committed by the victim; and (3) The trial court failed to consider appropriate mitigating factors and improperly weighted the sole enhancement factor. We will address each of these allegations in turn.

### I. Detective Wilson's Blood Spatter Testimony

The Defendant argues that the trial court erred by allowing Det. Wilson to testify regarding "blood spatter and blood spatter evidence" when he was not qualified to do so. The State contends that Det. Wilson's testimony was not expert testimony, but opinion testimony by a lay witness that satisfied the requirements of Tennessee Rule of Evidence 701. Alternatively, the State argues that, even if Det. Wilson's testimony was allowed in error, such error was harmless because Dr. Mileusnic-Polchan offered blood spatter testimony at trial without objection. We agree that the error was harmless.

During his direct testimony, Det. Wilson gave the following explanation of a crime scene photograph:

> This was again a photograph of [the victim] from the rear area where he was standing. . . .
>
> Essentially, you can see these areas here -- this area where the blood comes down his back was -- was pooling evidence as the victim was bleeding. This area in here is the exit area of nine projectiles of the buckshot, and that's where the blood had come from in the rear. Also from front. The entrance wound itself, it can't be seen in the photographs, was a very large entrance wound. Basically perforated the heart and -- just basically a funnel from his heart. There's a lot of blood and that's exactly the reason why. He's going to bleed out in most of the area here. And you can see -- once he actually stopped and this was his final resting position you can see the blood to the rear that leaked out and what was still in these areas.

What we noticed -- what I noticed that was indicative to me was there was a lot of blood in this area, somewhat, that had fallen. It was directly on top of areas of this shelving here. Not spatter evidence that was, you know, in the background, as far as an offshoot of the projectiles flying through, that was in this area, but appeared to be blood that would be expelled from the body while the human heart is still pumping. And there are -- those areas are open to allow that blood out.

This area right here, there was a very large amount of blood that had fallen into a bucket as you can see on the side, but as well into the bucket. There was water that was several inches deep in the bucket and there was enough blood in the short amount of time before he fell that leaked down into it that turned the water red.

At this point, defense counsel lodged the following objection: "Your Honor, at this point, we would object. He is no blood spatter expert and has no qualifications on blood spatter and we don't think he's qualified to --" The trial court did not allow the State an opportunity to lay a foundation to establish Det. Wilson's qualifications to answer the question at issue, but simply ruled, "I'm going to overrule the objection. I think that he can describe what he saw and what his conclusions were from that, sir. You can cross-examine him."

After the objection was overruled, Det. Wilson continued with his explanation:

Again, a larger amount of blood just concentrated in this area and in this area here. There's an area here where -- as can be seen, there is a pronounced absence of blood. There's also a relative area here where you can see it appears as if the blood is congregated in this area and then this area, a little bit here and then as the victim fell where the rest of it pooled out in this area here.

What we believe, and what the physical evidence indicated to me and to the others at the scene, was that the victim was standing in this area here. Then Mr. Boring was standing in this area here. Mr. Boring's photos clearly show that he had a large amount of blood -- it essentially covered his entire right arm as well as on his body. This would be consistent with what Mr. Boring and [the Defendant] have testified to later as to where persons in the room were standing. If Mr. Boring were standing in this area looking in this general direction and [the victim] were standing in this area, looking back in this general direction, then those areas of the trajectory, where they struck the victim, where the blood was located on the floor and on the scene, where the

-8-

blood was located on Mr. Boring and his testimony, all corroborate one another that [the victim] was, in fact, standing in this area here. Whenever he was struck in the heart and the blood very quickly began to expel out of this body in a large volume, this would be consistent to the rear of this area here, whereas he had nine pellets that blew out of his back as he perhaps started to turn, and again ended up in this position, would have traversed through this area here.

Detective Wilson was then asked to review another photograph of the victim "taken from near his head, looking toward his feet." Detective Wilson again gave a lengthy review of the photograph:

These areas that we described are here and they're even more pronounced in this photograph, relative absence of blood. And, again, there are some smaller amounts here as the victim were to start moving and turning, that blood is spurting out, it's going to cover those areas. But as you can see, there's a pronounced area here. One, two, three, four areas upon this table on top of it, to the side. These areas here are obviously more pronounced, where there's blood that had been there. This area here is almost completely covered. As you can see, the side of this bucket is almost entirely [red]. And inside that bucket, that water has a red hue to it. That's a lot of blood that was expelled out into this area. And, again, you can see as the victim fell he fell upon his right side, his right leg is underneath his left leg.

Unless qualified as experts, witnesses may only offer opinions or inferences which are both "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." This court has held that "lay opinion testimony under Rule 701 is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge which would qualify the witness as an expert under Rule 702." State v. Timothy Murrell, No. W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6 (Tenn. Crim. App. July 2, 2003) (citing United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002)).

On appeal, the Defendant cites to State v. Halake, in support of his argument that Det. Wilson's testimony was erroneous and prejudicial, thus requiring a new trial. See 102 S.W.3d 661 (Tenn. Crim. App. 2001). In Halake, the police discovered two small round

spots of the victim's blood on the defendant's pants legs. Id. at 669. Defense counsel objected when the prosecution asked a police detective to testify about the similarity between the blood spots on the defendant's pants and other blood spatter that the officer had observed from other gunshot wounds in other cases. Id. The officer, who had observed 100 crimes scenes and various forms of blood spatter, was not trained as an expert in identifying blood spatter. Id. After defense counsel's objection, the State attempted to lay a foundation to establish the officer's qualifications to answer the question. Id. at 670. The trial court then held a jury-out hearing and ruled that, while the officer was not qualified to testify as an expert based on his training, he could qualify as an expert based upon his observations of numerous blood spatters at other crime scenes. Id. The trial court also noted that his qualification as an expert was for the limited purpose of answering the prosecution's one question. Id. Following this ruling, the officer testified as permitted: The spots of the victim's blood found on the defendant's pants were consistent with other gunshot blood spatter based upon the officer's experience. Id. at 669. On appeal, a panel of this court held that the trial court erred by qualifying the officer as an expert, there not appearing to have been a sufficient basis to do so. Id. at 672. The court went on to hold that the defendant was prejudiced by the officer's testimony concerning the blood spatters. Id.

Here, the State argues that Det. Wilson was not offered as an expert witness and that his testimony as a lay witness was admissible pursuant to Rule 701, Tennessee Rules of Evidence. The State cites to State v. James Williams, in support of its argument that Det. Wilson's conclusion were based on his observations without further testing and could have been made by anyone with Det. Wilson's experience. See No. 88-175-III, 1988 WL 138843 (Tenn. Crim. App. Dec. 30, 1988), perm. appeal denied, (Tenn. Apr. 3, 1989). In Williams, the officer "testified, over objection, that marks on two of the four bullets were 'strike marks' caused by the indention of a firing pin[,]" and "the trial judge ruled that this testimony concerned 'a matter of such common knowledge that it doesn't take an expert to make a statement or observation about [it].'" Id. at *2. The panel reasoned that the officer "had 18 years of experience in police work" and that "the officer's conclusion was based on simple observation of the bullets, without further testing, and could have been made by anyone familiar with weapons." Id. However, given the nature of the testimony offered by Det. Wilson, we do not consider the facts in the Williams case to be analogous with the situation presented here.

Halake is directly on point to the case at bar. In Halake, this court concluded that "[t]he trial court properly categorized [the officer's blood spatter] testimony as expert testimony because his opinion testimony was predicated upon specialized knowledge that is unfamiliar to most lay-persons and that is normally offered as expert testimony, due to its complex nature." 102 S.W.3d. at 670-71 (citing State v. Melson, 638 S.W.2d 342 (Tenn. 1982) (recognizing "blood stain analysis" and the analysis of blood spatters as a field of

expertise); State v. Paul Dennis Reid, No. M1999-00803-CCA-R3-DD, 2001 WL 584283, at *18 (Tenn. Crim. App. May 31, 2001) (referring to the testimony of an expert in blood spatter analysis); State v. John Charles Johnson, No. M2000-00529-CCA-R3-CD, 2001 WL 208512, at *3-4 (Tenn. Crim. App. Mar. 1, 2001) (referring to the expert testimony of a forensic pathologist in blood spatter analysis), perm. appeal denied, (Tenn. July 9, 2001); State v. Damon Theodore Marsh, No. M1999-01879-CCA-R3-CD, 2000 WL 1449849, at *2 (Tenn. Crim. App. Sept. 29, 2000) (referring to the testimony of an expert on blood spatter analysis); State v. Joyce M. Lindsey, No. 02C01-9804-CR-00110, 1999 WL 1095679, at *6 (Tenn. Crim. App. Oct. 28, 1999) (referring to the testimony of an expert in blood spatter analysis), perm. appeal denied, (Tenn. June 26, 2000); State v. Allan Brooks, No. 01C01-9510-CC-00324, 1998 WL 754315, at *3 (Tenn. Crim. App. Oct. 29, 1998) (referring to the testimony of an expert in blood spatter analysis), perm. appeal denied, (Tenn. Apr. 19, 1999); State v. King David Johnson, Jr., No. 01C01-9610-CC-00430, 1997 WL 661501, at *2 (Tenn. Crim. App. Oct. 24, 1997) (referring to the testimony of an expert in blood spatter analysis); State v. Joey L. Kilzer, C.C.A. No. 1, Dyer County Criminal, 1988 WL 132721, at *1 (Tenn. Crim. App. Dec. 14, 1988) (referring to the expert testimony of a forensic pathologist in blood spatter analysis), perm. appeal denied, (Tenn. Apr. 3, 1989)).  The Halake court further noted that "[b]lood spatter analysis is a complicated subject, as the analyst studies the blood spatter and determines what blow created the spatter, thereby recreating the events of the crime."  Id. at 672 (citing Melson, 638 S.W.2d 342).  The panel further elaborated that "[o]ther states have also recognized the complexity of blood spatter analysis and the necessity of having a well-qualified expert testify regarding his or her analysis of the blood spatters."  Id. (citing State v. Goode, 461 S.E.2d 631 (N.C. 1995) (rejecting the defendant's argument that an expert was not sufficiently qualified as a blood spatter analyst, as the expert attended two training seminars on blood-spatter analysis, one basic and one advanced, as well as other courses that dealt with this type of analysis, and who now instructed other SBI agents on blood spatter analysis); Danny J. Veilleux, Annotation, Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as the "Blood Splatter" Interpretation, 9 A.L.R.5th 369, at § 15[a]-[b] (1993) (annotating cases in which police officers with sufficient training and expertise were allowed to testify as blood spatter analysis experts and cases in which police officers were deemed not to have sufficient qualifications to testify as experts)).

In the instant case, because the trial court abruptly ruled the testimony was admissible as observations by a lay witness, Det. Wilson's qualifications to testify a blood spatter expert were not addressed.  We note that later in Det. Wilson's direct testimony, Det. Wilson was asked about the two-by-four recovered from the scene, and he stated that "it's not my expertise to be a blood spatter expert but I can tell you the trailing . . . edges indicating the direction were all consistent with what we found."  The trial court's conclusion that Det. Wilson could testify as a lay witness did not have a basis in the rules of evidence.  Detective

-11-

Wilson's review of the photographs for the jury not only included his observations at the scene, but also included blood spatter analysis about a material fact disputed at trial—where the persons present in the room were positioned at the time of the shooting. Under these circumstances, there was not a sufficient basis established to qualify Det. Wilson as an expert in blood spatter, and we therefore hold that the trial court erred by allowing the testimony.

However, we agree with the State that such error was harmless. The medical examiner Dr. Darinka Mileusinc-Polchan offered blood spatter testimony, without objection, about the positioning of the individuals in the room when the Defendant shot the victim. Dr. Mileusinc-Polchan's testimony fell within her purview as a forensic pathologist. See John C. Johnson v. State, No. M2004-02675-CCA-R3-CO, 2006 WL 721300, at *14 (Tenn. Crim. App. Mar. 22, 2006), perm. appeal denied, (Tenn. Aug. 20, 2007). The Defendant did not offer any real evidence, other than his own self-serving statements, to dispute Dr. Mileusinc-Polchan's findings; her conclusions on the blood spatter evidence present at the scene were not seriously contradicted by any witness at trial. Dr. Mileusinc-Polchan's testimony encompassed Det. Wilson's conclusions about the blood spatter evidence he observed at the scene; and the jury obviously accredited Dr. Mileusinc-Polchan's testimony, which corroborated Mr. Boring's version of events. We are satisfied that the evidence established the Defendant's intent to kill the victim beyond a reasonable doubt. Therefore, it was harmless error. See Veilleux, supra, at § 15[b] (citing Commonwealth v. Duffey, 548 S.2d 1178 (Pa. 1988)) (the Pennsylvania Supreme Court, under similar circumstances as presented here, determined that the admission of the expert testimony by a state trooper regarding blood spatter analysis, although error, was harmless).

## II. Admissibility of Specific Violent Acts by the Victim

Next, the Defendant argues that the trial court erred in refusing to admit testimony from two witnesses, Rhonda Cooper and Carl Guillen, who would have testified concerning the victim's prior violent acts against them. The Defendant submits that this testimony was "corroborative" evidence in support of his contention that the victim was the first aggressor and that he acted in self-defense or defense of a third person. The Defendant contends that, had this testimony been allowed, the jury "would likely have . . . reach[ed] a different outcome in this case." The State responds that the trial court acted within its discretion when it limited testimony about prior violent acts allegedly committed by the victim. According to the State, because the Defendant was allowed to offer evidence regarding the victim's propensity for violence as well as testimony regarding specific instances of threats made by the victim toward the Defendant, the Defendant is not entitled to relief.

-12-

The trial court held a jury-out hearing at which the witnesses testified. Rhonda Cooper testified that she was familiar with the victim and the Defendant. When asked if the victim had ever pulled a firearm on her, she gave the following narrative of events:

> A. We were at Carl's little camper where --
> Q. Is that Carl Guillen?
> A. Yes. Little campsite like. There was a problem between [the victim] and Michael, which was my ex-boyfriend. And [the victim] left, went and got his gun and came back, and put the gun in my face. He had parked his car out in the street, walked up, put the gun in my face, and I began to cry and beg him not to shoot me, you know. . . .
> Q. Did he fire any shots that day?
> A. Yes, he did.
> Q. Okay. Did you see him fire the shots, just hear them?
> A. Yes, I did.
> Q. And what direction was the gun pointing when he did that?
> A. He was firing at Michael Davis and at Carl, but mostly at Michael. He was trying to shoot Michael.
> Q. Do you have any idea why he was trying to shoot Michael.
> A. They had been -- they had had an altercation. They were at odds -- he had before pulled a pistol on Michael at another time. They were having a disagreement over that. They had been fighting over that. And Michael hit him.

Ms. Cooper stated that everyone who worked at the Phelps' farm was aware of the incident. She could not recall whether she ever specifically discussed the incident with the Defendant, who was often present on the farm.

On cross-examination, Ms. Cooper was asked if the incident happened on June 28, 2006, but due the passage of time, she responded with only a "maybe." According to Ms. Cooper, the incident happened at the Phelps' farm in the area where Carl Guillen lived, and the only people present were her, Michael, Carl, and the victim. Ms. Cooper further elaborated that, when the victim left to go retrieve his gun, he tried to run them over with his car as he exited. Ms. Cooper acknowledged that the victim was charged with aggravated assault as a result of these events; however, she was not aware that the charges had been dismissed following her failure to appear in court.

Carl Guillen then testified about this earlier episode involving the victim. He gave a similar account of events as to that of Ms. Cooper. Mr. Guillen elaborated that the initial dispute happened three days prior to this June 2006 shooting, when the victim pulled a gun

on Michael Davis at the diary farm and threatened to shoot his tires because he would not leave the area. On June 28, when the victim arrived at Mr. Guillen's place, Michael punched the victim, and Mr. Guillen "broke up" the fight that ensued. It was then that the victim left to go get his weapon. On cross-examination, Mr. Guillen stated that, although he heard the gun fire, he did not see the victim shoot or know what the victim was shooting at. Mr. Guillen also testified that he did not have any specific discussions about this incident with the Defendant, although "it probably was discussed at times" amongst farm personnel.

Johnnie Phelps, a member of the family owning the Phelps' farm, also testified. He stated that the Defendant worked for him on the farm. Mr. Phelps said that he was familiar with the incident that occurred between the victim, Mr. Guillen, Ms. Cooper, and Ms. Cooper's boyfriend. Mr. Phelps relayed that the June 28, 2006 incident involving those individuals was "widely talked about" on the farm by farm employees and that the "vast bulk of the employees" knew about the altercation.

The trial court excluded the proffered evidence, ruling as follows:

The State v. Ray (phonetic) seems to the [c]ourt to be more on point, if you're looking at your annotations there. In a murder trial it's proper to exclude testimony of defense witnesses as to a specific instance of violent conduct by the victim offered to prove the first aggression by the victim since the testimony amounted to character evidence.

. . . It's not the Defendant's knowledge of a prior incident that makes the prior incident of conduct of the deceased admissible. The fact that he had a reputation for violence or reputation for going armed, the [c]ourt feels is admissible, to offer opinion testimony about his character for violence or his habit of carrying -- going armed. But to offer this specific instance with this Ms. Cooper and the holding the gun to her head, that is about his being angry and going back and getting a gun. And in this specific case, there's no indication that the deceased was armed at the time of this killing.

So, I don't understand -- you know, you're saying it's offered to show his aggression. I'm going to allow you to put on opinion testimony with respect to his character for violence. But to show this specific act, you have to give me another reason why it would be admissible.

Following a later jury-out hearing about the proposed testimony from Michael Owle, the trial court made the following notation:

And just to review briefly, what the [c]ourt -- the prior specific incidents of conduct that the Defendant had proffered earlier today [the testimony of Ms. Cooper and Mr. Guillen], the [c]ourt finds no basis for saying that those specific incidents are probative on this issue of self defense. There's no proof that the Defendant actually knew about them, the specific incident of holding the gun to the lady's head. So, they don't go to his state of mind. And they don't -- it doesn't seem to be material on the issue of who's the first aggressor, either. I mean, what those incidents have to do with the deceased's propensity to go get a gun and the evidence in this case is that he was unarmed at the time of the shooting. And so your argument that they're somehow relevant on the issue of who the first aggressor was, the [c]ourt didn't buy that.

A defendant may offer proof of a victim's prior violent acts under limited circumstances. In those cases in which a defendant's fear of the victim is relevant and the defendant is aware of the prior violent acts, the defendant, and the defendant alone, may testify concerning his or her knowledge of the victim's violent conduct. Williams v. State, 565 S.W.2d 503, 505 (Tenn. 1978); see also State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994). If the State questions his basis of knowledge concerning the prior violent acts, then the defendant may introduce the corroborating witnesses in rebuttal. Hill, 885 S.W.2d at 361 n.1. These witnesses may only testify as to what they told the defendant, not as to what they personally observed. Id.

In those cases in which it is alleged that the victim was the first aggressor, the defendant may offer evidence through the testimony of a third person to support this assertion. State v. Ruane, 912 S.W.2d 766, 781-82; see also Neil P. Coen, et al., Tennessee Law of Evidence § 4.04[5][d] (5th ed. 2005) ("[I]n a criminal case where there is some evidence suggesting that the victim was the first aggressor, the defendant may offer proof of the victim's prior violent acts with third persons."). This evidence is considered corroborative evidence, not substantive. Ruane, 912 S.W.2d at 781-82. Additionally, the defendant need not be aware of these prior violent acts. Hill, 885 S.W.2d at 357; see also State v. Furlough, 797 S.W.2d 631, 649 ("[W]hether the defendant knew of that reputation is irrelevant."). There are three prerequisites to the introduction of corroborative evidence of the victim's first aggressor tendencies: there must be proof that the defendant acted against the victim in self-defense; the trial court must determine whether there is a factual basis underlying the defendant's allegations that the victim had first aggressor tendencies; and the trial court must determine whether the probative value of the corroborative evidence is outweighed by the potential for unfair prejudice. State v. Billy Joe Henderson, No. 03C01-9804-CR-00139, 1999 WL 398087, at *6 (Tenn. Crim. App. June 18, 1999) (citing Ruane, 912 S.W.2d 766), perm. appeal denied, (Tenn. Nov. 22, 1999)

Following our review, we conclude that the trial court's ruling was erroneous. The Defendant sought admission of the evidence to corroborate his claim that the victim was the first aggressor and that he acted in self-defense or defense of another. Indeed, the trial court instructed the jury on the defense of self-defense and defense of a third person. The trial court should have proceeded to analyze the admissibility of the proffered proof. However, we determine that the trial court's failure in this regard is harmless.

The proof which the Defendant wanted to introduce was that the victim had earlier placed a pistol to a women's head and shot at her boyfriend following a physical altercation between the victim and the boyfriend. This is only weak corroboration of the Defendant's claim that the victim was the first aggressor during their confrontation. The victim was unarmed at the time the Defendant shot him, and the circumstances surrounding both incidents are dissimilar. Moreover, there was absolutely no proof in the record other than the Defendant's own statements that the victim made any move toward or against the Defendant or Mr. Boring. Additionally, while the Defendant was prevented from presenting testimony about this June 28, 2006 incident, he was permitted to present Michael Owle's testimony about specific prior violent acts and threats by the victim against the Defendant. The Defendant was also allowed to present testimony from other witnesses about the victim's violent character and reputation for violence in the community. Accordingly, we hold that the trial court's error does not affirmatively appear to have affected the result of the trial on the merits. See Tenn. R. App. P. 36(b). See, eg., State v. Charles Ray Allen, No. M1999-00818-CCA-R3-CD, 2000 WL 1649507, at *7 (Tenn. Crim. App. Nov. 3, 2000), perm. appeal denied, (Tenn. Apr. 9, 2001); State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *37 (Tenn. Crim. App. Sept. 22, 1997) ("[W]e are confident that the jury had before it a complete and accurate description of the violent, aggressive nature of the victim"), perm. appeal denied, (Tenn. Nov. 9, 1998).

*III. Sentencing*

The Defendant contends that the trial court erred in setting the length of his sentence at 18 years. At the time of the sentencing hearing, the Defendant was fifty-six years old, had never been married, and had no children. The Defendant reported that he moved to Tennessee in 1982, that he lived with his mother in Friendsville, and that he had three sisters who lived in Blount County. The Defendant listed his physical health as good, although he listed problems with "busted up joints" including his shoulder and knee and claimed to have "mild heart disease." He described his mental health as good. The Defendant stated that he had not used illegal drugs but admitted that he began drinking alcohol in 1975, stating that he drank eight 16-ounce beers two or three times a week, and would sometimes drink whiskey. The Defendant depicted episodes where he would go bar-hopping: "He would park his car on the edge of town and then walk from place to place 'honey-tonking.' After a night

-16-

of this he would walk back to his car and go home." He acknowledged that alcohol had caused some of his problems but said "he could quit using alcohol for many weeks at time if he wanted to." The Defendant claimed that "he was slowing down the amount he was drinking prior to his arrest" due to his age and health.

The Defendant reported that he left high school after the tenth grade due to his dyslexia, which caused him to be unable to complete his assignments. He claimed that he could read "very well" and had a "high IQ." The Defendant was last employed as a sweeper at Bevco Parking services, but left that job after his father died in 2004. He also claimed that "he used to do farm work." At the sentencing hearing, the Defendant testified that he had a head injury that kept him from working and that he was about to return to work when the shooting happened.

His criminal history showed multiple convictions for public intoxication and one conviction for possession of a weapon with the intent to go armed. The Defendant reported most of his prior arrests to his presentence officer; however, he thought the weapons charge had been dismissed, but the clerk of the court in Alcoa told the presentence officer that the Defendant had been convicted of the charge.

The victim's mother completed a Victim Impact Statement. She asserted that the Defendant, "a free loader," was asked to leave the property many times and that, on the day of the shooting, the victim had returned to make sure the Defendant had moved out. While she admitted that her son may have had a drinking problem, she considered him to be a "good man" and a hard worker, expressing profound grief over his death. The victim's mother, who had sought grief counseling, requested that the Defendant spend the "rest of his natural life" in jail. She also claimed that some of the victim's personal belongings had been stolen following the shooting. The victim's father also wrote a letter to the court, reiterating much of the same sentiment. The victim's mother and sister testified about their loss at the sentencing hearing.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial

court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). The defendant's potential for rehabilitation or treatment should also be considered. See Tenn. Code Ann. § 40-35-103(5).

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing

factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

Second degree murder is a Class A felony. See Tenn. Code Ann. § 39-13-210(c). As a Range I, standard offender, the Defendant faced a potential sentence of 15 to 25 years for his Class A felony conviction. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court imposed an enhanced sentence of 18 years.

In setting the length of the Defendant's sentences, the trial court found one enhancement factor to be applicable: the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1). The trial court also found that one mitigating factor applied: the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. § 40-35-113(11). In weighing these two factors, the trial court reasoned as follows:

> The [c]ourt is aware of this altercation that occurred with the incident with the pipe and his reaction to it. The [c]ourt finds that this mitigating factor certainly applies in this situation. . . .
>
> . . . .
>
> And [the c]ourt finds that that enhancement factor, although that enhancement factor involves criminal behavior, they do not rise to the level of felonies. It is an extensive criminal history that involves alcohol and a possession of a firearm.
>
> And it's unfortunate in our society that there's a lifestyle that the majority of our population simply do not understand. And that is the easy

resort to violence as a result of alcohol addiction, the use of alcohol, or drugs. It seems to be endemic that the appropriate way to resolve disputes under those circumstances is resort to the availability of a weapon.

Now, this is not to mean that in giving this enhancement factor greater weight than the mitigating factor, this [c]ourt is seeking to rely on any other elements other than the elements of this offense.

This is why the enhancement factor outweighs the mitigating factor. Because the [D]efendant has had a prior history of alcohol addiction, or alcoholic-related crimes, and has possessed a weapon. And those two volatile factors, in themselves, are going to lead to violence. Ultimately, they're going to lead to violence.

Therefore, that enhancement factor outweighs the mitigating factor that the [c]ourt has found.

The Defendant argues that the trial court erred in the several ways. First, the trial court erred by applying enhancement factor (1) due to "the remoteness of [the Defendant's] minor criminal offenses." Second and alternatively, the trial court erred by giving enhancement factor (1) more weight than mitigating factor (11). According to the Defendant, the reasoning behind the trial court's decision to more heavily weigh the enhancement factor "is flawed due to the fact that by all accounts and evidence [the Defendant] was not impaired by alcohol or any other substance at the time of the incident in this cause." Third, the trial court erred by not finding three additional mitigating factors applicable in setting the length of the Defendant's sentence: (2) the Defendant acted under strong provocation; (3) substantial grounds exist tending to excuse or justify the Defendant's criminal conduct, though failing to establish a defense; and (10) the Defendant assisted the authorities in locating or recovering any property or person involved in the crime. See Tenn. Code Ann. § 40-35-113(2), (3), (10). The State argues that the record supports the application of enhancement factor (1) based upon the Defendant's multiple prior convictions for public intoxication and one prior conviction for possession of a weapon with the intent to go armed. In regard to factors for mitigation, the State submits that, "[a]lthough the [D]efendant asked the trial court to consider the other mitigating factors, the trial court, in its discretion, chose not to apply them in this case." Because the trial court considered the relevant advisory factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act, the State asks us to affirm the sentence.

Given the facts of this case, we conclude that enhancement factor (1) was properly applied given that the Defendant has previous convictions, albeit misdemeanors, which

indicate a history of similar behavior. See, e.g., State v. Johnny Robinson, No. 02C01-9505-CC-00126, 1996 WL 89419, at *2 (Tenn. Crim. App. Feb. 29, 1996) (defendant had no prior felony convictions, but did have at least two convictions for driving under the influence, two convictions for driving with a revoked license, and three convictions for public intoxication, which were similar to convictions at issue; therefore, the trial court, was entitled to give considerable weight to the factor in assessing the length of the vehicular assault sentence). In its sentencing determination, the trial court did consider the mitigating factors espoused by the Defendant but found only one factor applicable to the Defendant. The weight to be given the various factors is within the broad discretion afforded our trial courts. We conclude that the trial court did not err or abuse its discretion in setting the Defendant's sentence at 18 years.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's conviction and sentence for second degree murder.

_____
D. KELLY THOMAS, JR., JUDGE